UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


**JAMES BLAKNEY,**

    c/o Cohen Milstein Sellers Toll PLLC
    1100 New York Avenue NW
    Suite 800
    Washington, DC 20005

          **Plaintiff,**

**v.**

**MEDICAL TRANSPORTATION
MANAGEMENT, INC.**                  Civil Action No. 1:25-cv-4339
                                      **Jury Trial Demanded**

    635 Maryville Centre Drive
    Suite 300
    St. Louis, MO 63141

**ONTIME TRANSPORTATION, INC.**

    7604 Marietta Lane
    College Park, MD 20740

          **Defendants.**


COMPLAINT


1.     This lawsuit calls on Medical Transportation Management, Inc. ("MTM") to adopt a fair and nondiscriminatory background screening policy. While criminal background checks can serve as a legitimate tool for employers to screen their workforce, MTM's background check policy is overly broad and unduly harsh. In practice, it resulted in the unnecessary firing of an employes with a demonstrated track record of successful employment.

MTM's policy disqualifies employees based on criminal history that is not related to the job at issue or occurred so long ago that it is irrelevant to any fair determination of employee honesty, reliability, or safety.

2.    MTM's policy is not only overly harsh; it also has a discriminatory effect on qualified Black workers. The number of Americans who have a criminal record has increased dramatically in recent decades; historically, and at present, Black people have been hardest hit by this national trend. Since 2009, over 90% of the persons convicted of crimes in the District of Columbia were Black, despite Black individuals constituting an average of 50% of the total population. This is due not to disproportionate rates of criminal activity, but to racial profiling and other discriminatory policies and practices in our criminal justice system. The effects of those discriminatory practices then egregiously permeate all aspects of these individuals' lives. But local antidiscrimination laws prohibit companies from irrationally using criminal convictions in employment decisions in a way that replicates these patterns of discrimination, including MTM's use of criminal background checks.

3.    Decades of empirical research confirm that facially neutral criminal background screening policies can produce unlawful disparate impacts when they disproportionately exclude otherwise qualified workers of a particular race. D.C. discrimination law consequently prohibits employers from relying on selection criteria that systematically and unjustifiably disadvantage Black workers. When employers adopt blanket disqualification rules untethered to job-relatedness or business necessity, those rules fall squarely within the category of practices that antidiscrimination laws deem unlawful.

4.    These disparate impacts do not arise in a vacuum. Black people are disproportionately burdened by the criminal justice system because of long-standing structural

inequities, including differential policing practices, racial profiling, selective enforcement, disparities in charging and sentencing, and other discriminatory policies. As a result, Black Americans—not because of higher rates of criminal activity, but because of these inequitable systems—are far more likely to have a criminal record. The use of expansive, overbroad, or stale criminal background screens thus predictably and disproportionately screens out qualified Black applicants and employees.

5.     Employers are required to ensure that any consideration of criminal history is narrowly tailored and linked to legitimate job-related concerns. MTM's policy does the opposite. By imposing sweeping criminal record exclusions that bear no demonstrable relationship to its employees' actual duties or performance and without verifying accuracy or allowing drivers to contest exclusion, MTM predictably amplifies the very racial disparities that antidiscrimination laws are designed to prevent.

6.     Plaintiff James Blakney, through undersigned counsel, seeks to remedy the violation of his rights secured by the District of Columbia Human Rights Act, D.C. Code § 2-1401.01 *et seq.*; the D.C. Wage Payment and Collection Law ("DCWPL"), D.C. Code § 32-1301 *et seq.*; and the D.C. Living Wage Act ("DCLWA"), D.C. Code § 2-220.01 *et seq.* (collectively, the "D.C. Wage Laws"), against MTM and MTM's subcontractor OnTime Transportation, Inc. ("OnTime") (collectively, "Defendants"). He alleges that MTM's use of criminal background checks unfairly and disproportionately limits opportunities for qualified Black employees and applicants in violation of local antidiscrimination law, and that MTM and OnTime jointly failed to pay him all wages owed for the work he performed for them.

**JURISDICTION AND VENUE**

7.      This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332 because there is complete diversity of the parties and the amount in controversy exceeds $75,000.

8.      Venue is proper in this Court pursuant to 42 U.S.C. § 2000e-5(f)(3) and D.C. Code §§ 11-921, 13-423(a)(1), (2) because the acts alleged in this Complaint arose in the District of Columbia and Plaintiff was terminated from a job that took place in Washington, D.C.

**THE PARTIES**

9.      Plaintiff James Blakney is a D.C. resident and worked as a driver in D.C. for Defendant MTM through one of its subcontractors, Defendant OnTime.

10.     Defendant MTM is a Missouri-based healthcare and transportation management company.

11.     Defendant MTM is incorporated in the state of Missouri, with its headquarters at 635 Maryville Centre Drive, Suite 300, St. Louis, MO 63141. Its Washington, D.C. office is located at 300 M Street SE, Suite 825, Washington, D.C. 20003. At all times relevant to this complaint, Defendant MTM subcontracted to Defendant OnTime for medical transportation services.

12.     Defendant OnTime is a Maryland-based transportation company.

13.     Defendant OnTime's principal office is located at 7604 Marietta Lane, College Park, MD 20740. At all times relevant to this complaint, OnTime was a subcontractor to MTM.

**PROCEDURAL HISTORY**

14.    On June 26, 2025, Mr. Blakney timely filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") against MTM based on his termination following a criminal background check. Mr. Blakney explicitly challenged the criminal background check policy used by MTM because it has a disparate impact on Black citizens in violation of the D.C. Human Rights Act. Mr. Blakney cross-filed his Charge with the D.C. Office of Human Rights. On September 25, 2025, the EEOC issued Mr. Blakney a Notice of Right to Sue.

**FACTUAL ALLEGATIONS**

I.    **Plaintiff Blakney's Work for MTM and OnTime**

15.    Plaintiff James Blakney is a 61-year-old Black man whose employment with MTM and OnTime as a transportation driver was unfairly terminated based on a 20-year-old criminal charge, despite three years of successful employment as a driver for MTM and OnTime.

16.    Since 2007, MTM has contracted with D.C. to provide a variety of transportation services to D.C. residents. Since that time, the District of Columbia and MTM have renewed the contracts for these services several times. Current contracts have been extended until at least April 2026. MTM in turn subcontracts with various transportation contractors, including OnTime, to fulfill these contracts.

17.    Mr. Blakney began working as a full-time van driver for OnTime and MTM in or about June 2021. His work for OnTime and MTM was his exclusive employment. In this role, he transported clients—typically dialysis patients and adults with intellectual disabilities—to and from their health appointments and classes in D.C. Mr. Blakney drove clients every Monday

through Friday and every other Saturday for over three years. This added up to over 8,000 hours of driving across some of the busiest parts of D.C., ensuring that clients made their appointments on time and that they returned home safely afterwords.

18.   Mr. Blakney enjoyed his work and got along well with his clients. He was an excellent employee and a safe and reliable driver. Clients told him that they appreciated his punctuality. He built a good rapport with his clients, many of whom he drove regularly on a daily or weekly basis.

19.   OnTime furnished Mr. Blakney with the van that he drove, which had OnTime's logo on the side. OnTime paid for gas for the van.

20.   Throughout Mr. Blakney's employment, MTM contracted with OnTime to provide transportation services. It was Mr. Blakney's understanding that MTM was OnTime's exclusive long-term contract. During Mr. Blakney's employment, MTM and OnTime controlled all relevant aspects of Mr. Blakney's employment. MTM provided Mr. Blakney with annual training on job duties and rules, including road safety reminders and instructions on how to interact with clients.

21.   MTM provided OnTime with a daily list of patient trips. OnTime then set Mr. Blakney's daily schedule and driving routes. OnTime would relay the schedule to Mr. Blakney by text each morning. Mr. Blakney drove patients in the NW and NE quadrants of D.C. and did not have the autonomy to direct daily schedules and driving routes.

22.   MTM exercised oversight over Mr. Blakney, placing a camera in his van, from which it could surveil Mr. Blakney during the workday. MTM also supervised Mr. Blakney's conduct by maintaining a complaint and grievance system for clients to report any issues with their driver, to which MTM responded and took action accordingly.

23.     MTM conducted surprise inspections during which its inspector would examine the condition of the van, the driver licenses of Mr. Blakney and other drivers, and monitor timeliness. This occurred multiple times a year. In the summer of 2024, MTM suspended its contract with OnTime for one month due to the conditions of their vans observed during an inspection, which shut down the business for that time.

24.     MTM had authority to review and monitor Mr. Blakney's credentials, such as licensure, criminal background checks, and insurance requirements, and remove him from trips if they deemed his credentials out of date or insufficient.[1]

25.     MTM had the authority to fire Mr. Blakney and did so. When MTM instructed OnTime that Mr. Blakney could not drive MTM clients on the basis of his criminal background check, this was equivalent to termination.

26.     Every year, MTM required Mr. Blakney to submit to a criminal background check. His first three annual background checks were accepted without issue.

27.     In September 2024, after Mr. Blakney had been working for MTM for three years, he was fired following his fourth background check, despite the fact that there had been no change in his criminal record in the time that he worked for MTM and OnTime. Instead, the background check flagged—and MTM fired him based on—a criminal charge that occurred over *20 years ago*.

28.     MTM was aware of Mr. Blakney's criminal history, as it performed annual criminal background checks for the entirety of his employment. Every year, OnTime arranged and paid for Mr. Blakney to complete an FBI background check. OnTime then provided the

---

[1] *See Welcome to Provider Onboarding*, MTM Health, https://www.mtm-inc.net/driverswanted/ (last visited Dec. 12, 2025).

background check to MTM. On information and belief, the information in Mr. Blakney's criminal background check did not change from 2021 to 2024.

29.    On August 22, 2024, shortly before Mr. Blakney's termination, MTM conducted Mr. Blakney's background check. An MTM Credentialing Coordinator explained to OnTime in an email, "[His] credential was rejected for the following reason Record indicates violation that is not acceptable: 5.I - No prior convictions for a sexual crime or crime of violence. It violates the TPSA. The driver's record shows assault on a police officer." But the criminal record referenced in MTM's email was a more than two-decade old charge that did not result in a conviction for assault. In November 2000, Mr. Blakney was charged with assault on a police officer and destruction of property. The charges were quickly changed to simple assault and destruction of property. On December 12, 2000, Mr. Blakney pled guilty to only misdemeanor destruction of property. Mr. Blakney was sentenced to 180 days suspended, and two years of probation.

30.    At no point before 2024 did Mr. Blakney's criminal record—including charges that did not result in conviction—raise an issue for MTM. MTM's policy, as stated in the Credentialing Coordinator's email, prohibits "prior convictions" for crimes of violence. To be clear, the incident referenced did not even result in a conviction for a crime of violence, but merely misdemeanor destruction of property. Regardless, the policy is impermissibly discriminatory. MTM's apparent zero-tolerance policy for violent convictions or charges for crimes of violence, no matter how old and with no regard to demonstrated job performance, caused Mr. Blakney to be terminated on or about September 11, 2024.

31.     Neither MTM nor OnTime provided a legitimate business justification for his termination. When Mr. Blakney called MTM regarding his background check, they refused to speak with him.

II.     **MTM's Criminal Background Check Policy is Unlawful and Racially Discriminatory**

  A.  **MTM's Criminal Background Check Policy Has a Discriminatory Effect on Black Workers**

32.     MTM's policy and practice of denying job opportunities to employees with certain charges and convictions has a discriminatory effect on Black workers.

33.     According to the U.S. Chamber of Commerce, 79 million Americans have a criminal record.[2] An estimated 14 to 15.8 million Americans of working age are formerly incarcerated or have a felony conviction.[3] Of the 44,000 state and federal collateral consequences faced by these individuals, roughly 70% pose barriers related to employment.[4]

34.     As a result of the racial inequities present in the criminal justice system, these employment barriers harm Black workers at a much higher rate than other groups. Nationally,

---

[2] Stephanie Ferguson Melhorn, Makinizi Hoover, & Isabella Lucy, *The Workforce Impact of Second Chance Hiring*, U.S. Chamber of Com. (Sep. 18, 2024), https://www.uschamber.com/workforce/data-deep-dive-the-workforce-impact-of-second-chance-hiring-3.

[3] Cherrie Bucknor & Alan Barber, *The Price We Pay: Economic Costs of Barriers to Employment for Former Prisoners and People Convicted of Felonies*, Ctr. for Econ. & Pol'y Rsch., June 2016, at 1, https://cepr.net/images/stories/reports/employment-prisoners-felonies-2016-06.pdf.

[4] U.S. Comm'n on Civ. Rts., *Collateral Consequences: The Crossroads of Punishment, Redemption, and the Effects on Communities*, June 2019, at 35, https://www.usccr.gov/files/pubs/2019/06-13-Collateral-Consequences.pdf.

28% of arrestees are Black[5], although Black people comprise 14.4% of the overall US population.[6] Black citizens are incarcerated at a rate six times that of their white counterparts.[7] As of 2023, 36.7% of prisoners in federal correctional facilities were Black.[8]

35. Racial disparities are even more pronounced in the District of Columbia. Black individuals in D.C. are arrested at rates 10 times higher than that of their white counterparts.[9] The D.C. Sentencing Commission ("Commission") reports that in 2024, 91.5% of the adults sentenced for felonies in D.C. Superior Court were Black,[10] a statistic that has remained constant for decades. For example, between 1993 and 1998, 95% of the individuals sentenced for felonies were Black.[11] Of the 17,332 individuals convicted and sentenced during the 1993 to 1998 period,

---

[5] Fed. Bureau of Investigation: Crime Data Explorer, *Arrestee Race*, (Nov. 15, 2025), https://cde.ucr.cjis.gov/LATEST/webapp/#/pages/explorer/crime/arrest.

[6] Gracie Martinez & Jeffrey S. Passel, *Facts About the U.S. Black Population*, Pew Rsch. Ctr. (Jan. 23, 2025), https://www.pewresearch.org/race-and-ethnicity/fact-sheet/facts-about-the-us-black-population/.

[7] Leah Wang, *Updated Charts Show the Magnitude of Prison and Jail Racial Disparities, Pretrial Population, Correctional Control, and More*, Prison Pol'y Initiative: Blog (Apr. 1, 2024), https://www.prisonpolicy.org/blog/2024/04/01/updated-charts/.

[8] Derek Mueller & Rich Kluckow, *Prisoners in 2023 – Statistical Tables*, U.S. Dep't of Just., Bureau of Just. Stat. 45 (Sep. 2025), https://bjs.ojp.gov/document/p23st.pdf.

[9] *Racial Disparities in D.C. Policing: Descriptive Evidence from 2013-2017,* ACLU D.C.: Publ'ns (July 31, 2019), https://www.acludc.org/publications/racial-disparities-dc-policing-descriptive-evidence-2013-2017/.

[10] D.C. Sent'g Comm'n, *2024 Annual Report* 52 (2025), https://scdc.dc.gov/sites/default/files/dc/sites/scdc/page_content/attachments/2024%20Annual%20Report%20-%20FINAL%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.pdf.

[11] D.C. Truth in Sent'g Comm'n, *Criminal Sentencing Practices in the District of Columbia: 1993-1998* 17-18 (1999), https://scdc.dc.gov/sites/default/files/dc/sites/scdc/publication/attachments/CriminalSentencingPractices.pdf.

10

15,321 were Black, 624 were white, and 193 were other races.[12]

36.     The data published by the Commission indicates that these historical trends of disproportionate convictions of Black citizens continue to this day. Since 2009, over 90% of felony sentences in the District of Columbia were imposed on Black individuals[13], despite Black

---

[12] *Id.* at 23 (information about race was missing from 1,193 cases).

[13] D.C. convicted persons data by year: D.C. Sent'g & Crim. Code Revision Comm'n, *2009 Annual Report* 16-17 (2010), https://scdc.dc.gov/sites/default/files/dc/sites/scdc/publication/attachments/annual_report_2010.pdf; D.C. Sent'g & Crim. Code Revision Comm'n, *2010 Annual Report* 20-21 (2011), https://scdc.dc.gov/sites/default/files/dc/sites/scdc/publication/attachments/annual_report_2010_final.pdf; D.C. Sent'g & Crim. Code Revision Comm'n, *2011 Annual Report* 37, 39 (2012), https://scdc.dc.gov/sites/default/files/dc/sites/scdc/publication/attachments/Annual_Report_2011.pdf; D.C. Sent'g & Crim. Code Revision Comm'n, *2012 Annual Report* 42 (2013), https://scdc.dc.gov/sites/default/files/dc/sites/scdc/publication/attachments/annual_report_2012_0.pdf; D.C. Sent'g & Crim. Code Revision Comm'n, *2013 Annual Report* 47-48 (2014), https://scdc.dc.gov/sites/default/files/dc/sites/scdc/publication/attachments/Annual_Report2013.pdf; D.C. Sent'g & Crim. Code Revision Comm'n, *2014 Annual Report* 59 (2015), https://scdc.dc.gov/sites/default/files/dc/sites/scdc/publication/attachments/Annual_Report_2014.pdf; D.C. Sent'g & Crim. Code Revision Comm'n, *2015 Annual Report* 57 (2016), https://scdc.dc.gov/sites/default/files/dc/sites/scdc/publication/attachments/Annual%20Report%202015%20Website%205-2-16.pdf; D.C. Sent'g Comm'n, *2016 Annual Report* 32 (2017), https://scdc.dc.gov/sites/default/files/dc/sites/scdc/publication/attachments/Final%202016%20Annual%20Report%20%204-24-17.pdf; D.C. Sent'g Comm'n, *2017 Annual Report* 33 (2018), https://scdc.dc.gov/sites/default/files/dc/sites/scdc/page_content/attachments/Sentencing%20Commission%202017%20Annual%20Report.pdf; D.C. Sent'g Comm'n, *2018 Annual Report* 35 (2019), https://scdc.dc.gov/sites/default/files/dc/sites/scdc/page_content/attachments/Sentencing%20Commission%202018%20Annual%20Report.pdf; D.C. Sent'g Comm'n, *2019 Annual Report* 35 (2020), https://scdc.dc.gov/sites/default/files/dc/sites/scdc/service_content/attachments/Annual_Report_Final%2004-10-2020.pdf; D.C. Sent'g Comm'n, *2020 Annual Report* 38 (2021), https://scdc.dc.gov/sites/default/files/dc/sites/scdc/service_content/attachments/Annual_Report_2020.pdf; D.C. Sent'g Comm'n, *2021 Annual Report* 37 (2022), https://scdc.dc.gov/sites/default/files/dc/sites/scdc/page_content/attachments/2021%20SCDC%20Annual%20Report.pdf; D.C. Sent'g Comm'n, *2022 Annual Report* 42 (2023), https://scdc.dc.gov/sites/default/files/dc/sites/scdc/page_content/attachments/2022%20Sentencing%20Commission%20Annual%20Report.pdf; D.C. Sent'g Comm'n, *2023 Annual Report* 49 (2024),

people constituting an average of 50% of the total population.[14]



37.     Black residents in the Washington, D.C. metropolitan area are incarcerated at

rates significantly higher than white residents. According to D.C. Department of Corrections data,

87.8 % of persons detained in local jails in 2023 were Black, despite making up only 45% of the

D.C. population.[15] Based on data from the Bureau of Justice Statistics, Black individuals are

---

https://scdc.dc.gov/sites/default/files/dc/sites/scdc/page_content/attachments/2023%20Annual%2
0Report%20.pdf; D.C. Sent'g Comm'n, *supra* note 10, at 52.

[14] *See Population Estimate, Total, Not Hispanic or Latino, Black or African American Alone (5-
year Estimate) in District of Columbia, DC*, Fed. Rsrv. Bank of St. Louis (Dec. 12, 2024, at
13:52 CT), https://fred.stlouisfed.org/graph/?id=B03002004E011001;
*Resident Population in the District of Columbia*, Fed. Rsrv. Bank of St. Louis (Dec. 23, 2024, at
14:51 CT), https://fred.stlouisfed.org/series/DCPOP.

[15] D.C. Dep't of Corr., *Facts and Figures* 17 (2024),
https://doc.dc.gov/sites/default/files/dc/sites/doc/publication/attachments/DC%20Department%2
0of%20Corrections%20Facts%20and%20Figures%20January%202024_0.pdf.

incarcerated at 16 times the rate of white individuals in the District of Columbia.[16]

38.    Black citizens also experience disproportionate rates of incarceration in Maryland and Virginia (5.5 and 5.9 times the rate of white citizens, respectively).[17] Stated differently, Black citizens are overrepresented in prisons and jails. Black people represent 71.5% of Maryland's incarcerated population but only 32% of the state's total population.[18] Similarly, Black people constitute 53% of incarcerated individuals but only 21% of the total population in Virginia.[19]

39.    The barriers faced by Black citizens with charges and convictions are exacerbated by employers' biases. One study on the impact of criminal records on employment found that having a criminal record reduces the likelihood of a callback or job offer by 50 percent.[20] Black people with criminal records are particularly disadvantaged. Of those with criminal records, 60% of Black applicants did not receive callbacks or job offers, compared to 30% of white applicants.[21]

---

[16] Wendy Sawyer, *Racial Disparities in Washington, D.C. Incarceration Rates*, Prison Pol'y Initiative: Publ'ns (2023), https://www.prisonpolicy.org/graphs/rates2021/DC_Rates_2021.html (interpreting data from the U.S. Bureau of Justice Statistics).

[17] Marc Mauer & Ryan S. King, *Uneven Justice: State Rates of Incarceration by Race and Ethnicity*, Prison Pol'y Initiative: Sent'g Project 11 (2007), http://prisonpolicy.org/scans/sp/Uneven-Justice-State-Rates-of-Incarceration-by-Race-and-Ethnicity.pdf.

[18] Md. Dep't of Pub. Safety & Corr. Servs., *July 2022 Inmate Characteristics*, https://dpscs.maryland.gov/publicinfo/publications/pdfs/Inmate%20Characteristics%20Report%20FY%202022%20Q4.pdf (last visited Dec. 12, 2025); Am. Counts Staff, *Maryland's Population Grew 7% to 6,177,224 Last Decade*, U.S. Census Bureau (Aug. 25, 2021), https://www.census.gov/library/stories/state-by-state/maryland.html#race-ethnicity.

[19] *Virginia*, Vera: Incarceration Trends (Oct. 16, 2024, at 11:16 UTC), https://trends.vera.org/state/VA.

[20] U.S. Comm'n on Civ. Rts., *supra* note 5, at 35.

[21] *Id.* at 36.

40.     By barring individuals with certain types of charges and convictions from employment, regardless of when they occurred, MTM's criminal background check policy has had a disparate impact on Black workers like Mr. Blakney by precluding them from retaining their employment with MTM and its contractors.

41.     There are no educational or technical requirements to be a driver for MTM other than having a current ordinary (Class D) driver's license.

### B. MTM's Criminal Background Check Policy Is Not Job-Related or Consistent with Business Necessity

42.     MTM terminated Mr. Blakney based on the following criminal background check policy: 5.I – No prior convictions for a sexual crime or crime of violence.[22]

43.     MTM's criminal background check policy is overly broad and unnecessarily restrictive because it excludes workers on the basis of convictions that occurred in the distant past, no matter how long it has been since the conviction occurred. This blanket ban is not based on scientific or other evidence of whether the conviction is likely to predict worker wrongdoing. Further, as evidenced by Mr. Blakney's experience, MTM goes even further than its stated policy in practice by terminating individuals for charges that do not result in convictions. Its stated policy is discriminatory; its practice of terminating employees based on unproven charges is even more so.

44.     MTM's criminal background check policy fails to provide for an individualized assessment to determine whether employees have disqualifying criminal convictions and if those convictions are job-related.

---

[22] Med. Transp. Mgmt. Inc., *Transportation Provider Services Agreement* 7 (2023), https://www.pa.gov/content/dam/copapwp-pagov/en/dhs/documents/healthchoices/documents/transportation-provider-services-agreement-01-01-2023.pdf.

45.     As exemplified in Mr. Blakney's case, MTM failed to do more than relay its finding and automatic decision that Mr. Blakney could not drive MTM clients. It failed to determine if Mr. Blakney actually had a disqualifying criminal conviction—in fact, the record referenced was merely a charge and not a conviction—or analyze whether a misdemeanor conviction for destruction of property in 2000 had impacted his ability to safely and effectively do his job for the past three years (it did not). Any argument that terminating Mr. Blakney was a business necessity is undercut by the fact that Mr. Blakney successfully worked for MTM for three years preceding his termination.

46.     MTM's policy disregards the significant amount of time that has passed since Mr. Blakney's involvement with the criminal legal system, as well as the personal and professional strides he has made since then. It also provides no avenue for employees like Mr. Blakney to explain or challenge MTM's determination that their records are disqualifying.

47.     By the time that Mr. Blakney was fired, he had been driving MTM's clients every Monday through Friday and every other Saturday for over three years. This equates to over 8,000 hours of pick-ups and drop-offs across D.C., during which Mr. Blakney maintained a successful driving record. MTM's policy fails to consider this established track record of job performance.

### C.  Less Restrictive Alternatives Are Available to Achieve MTM's Legitimate Business Needs

48.     There are less discriminatory alternatives that MTM could adopt that would be fair and nondiscriminatory.

49.     Fair and nondiscriminatory alternatives include: removing or significantly limiting the use of permanent disqualification based on certain criminal convictions; modifying the cutoff dates for certain criminal convictions based on available scientific or other evidence of whether the conviction is likely to predict future worker wrongdoing; limiting disqualification

15

based on prior criminal convictions to convictions that are sufficiently related to the particular job at issue; and providing employees and applicants the opportunity to rebut presumptive disqualification by explaining why their criminal history is no longer relevant.

50.     In April 2012, the EEOC issued enforcement guidance on employers' consideration of arrest and conviction records when making employment decisions ("EEOC Guidance" or "Guidance").[23] In the Guidance, the EEOC discussed how employers' use of criminal history information can violate Title VII of the Civil Rights Act, explaining that policies that are facially race-neutral can result in disparate impact liability under Title VII if they disproportionately impact racial minorities (or other protected groups) and are not job-related and consistent with business necessity.[24]

51.     A criminal exclusion policy that has a disparate impact must have a "manifest relationship to the employment in question" *Griggs v. Duke Power Co.*, 401 U.S. 424, 432 (1971) and be necessary for "safe and efficient job performance" *Dothard v. Rawlinson*, 433 U.S. 321, 331 n.14 (1977) in order for it to not violate the law. *See also Green v. Missouri Pac. R.R. Co.*, 523 F.2d 1290, 1298 (8th Cir. 1975) ("We cannot conceive of any business necessity that would

---

[23] Equal Emp. Opportunity Comm'n, *Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act*, (Apr. 25, 2012), https://www.eeoc.gov/laws/guidance/enforcement-guidance-consideration-arrest-and-conviction-records-employment-decisions (42 U.S.C. § 2000e *et seq.*). The EEOC previously issued guidance on these matters in 1987 and 1990. *See* Equal Emp. Opportunity Comm'n, *Policy Statement on the Issue of Conviction Records under Title VII of the Civil Rights Act of 1964* (Feb. 4, 1987); Equal Emp. Opportunity Comm'n, *Policy Statement on the Use of Statistics in Charges Involving the Exclusion of Individuals with Conviction Records from Employment* (July 29, 1987); Equal Emp. Opportunity Comm'n, *Policy Guidance on the Consideration of Arrest Records in Employment Decisions under Title VII of the Civil Rights Act of 1964* (Sep. 7, 1990).

[24] In interpreting and applying the provisions of the D.C. Human Rights Act, the D.C. Circuit looks to cases construing Title VII. *See Estenos v. PAHO/WHO-Fed. Credit Union*, 952 A.2d 878, 886 (D.C. 2008).

automatically place every individual convicted of any offense, except a minor traffic offense, in the permanent ranks of the unemployed. This is particularly true for blacks who have suffered and still suffer from the burdens of discrimination in our society. To deny job opportunities to these individuals because of some conduct which may be remote in time or does not significantly bear upon the particular job requirements is an unnecessarily harsh and unjust burden.").

52.      The EEOC Guidance encourages employers who choose to rely on criminal background checks to consider three factors in order to ensure that their use of the checks is job-related and consistent with business necessity: (1) the nature and seriousness of the offense, (2) the amount of time that has passed since the offense, and (3) whether the offense has any relationship to the job at issue. The Guidance also recommends that employers give job applicants and employees the opportunity to explain why they are qualified despite the past criminal offense.

53.      Alternatively, the EEOC recommends that employers validate their criminal record check policies under the Uniform Guidelines on Employee Selection Procedure, the framework of principles governing federal employee selection consistent with federal anti-discrimination laws. 29 C.F.R. § 1607.1 *et seq*.

54.      MTM's practice of an indiscriminate ban regarding crimes of violence fails to consider any of the factors outlined in the EEOC Guidance. As to the first factor, MTM fails to consider the nature and seriousness of the offense. An indiscriminate ban on crimes of violence is broad and vague. Such a ban treats a misdemeanor conviction for destruction of property the same as first degree murder. Second, a blanket ban fails to consider the amount of time that has passed since an individual's criminal conviction, despite the fact that this is the one of the strongest

17

predictors of risk of re-offending.[25] Third, MTM policy and practice fails to consider whether the offense has any relationship to an individual's job. Lastly, MTM does not provide any opportunity for employees with criminal records to explain how they are qualified for their position despite a past criminal offense.

### III.     Misclassification and Wage and Hour Violations

55.     In addition to unfairly terminating him, MTM and OnTime failed to pay Mr. Blakney the D.C. living wage and overtime pay, and misclassified Mr. Blakney as an independent contractor in violation of D.C. wage and hour laws.

56.     Typically, Monday through Friday and every other Saturday, Mr. Blakney transported between six and ten clients a day to and from their destinations. His first pickup was generally around 5 A.M., and his last drop off was generally around 4:15 or 4:30 P.M. Roughly every other day, Mr. Blakney was required to then drive to Costco for gas, adding about half an hour to his day. He did not have a break for lunch. Mr. Blakney worked approximately between 55 and 72 hours per week.

57.     For the duration of Mr. Blakney's employment with MTM and OnTime, he spent the entirety of each week working in the District of Columbia.

58.     OnTime paid Mr. Blakney by personal check every other Saturday. Mr. Blakney would coordinate to meet up with OnTime's owner to pick up his paycheck. He did not receive paystubs.

59.     MTM and OnTime unlawfully classified Mr. Blakney as an independent contractor rather than an employee, despite the fact that they controlled all aspects of his work

---

[25] In addition to time since last conviction, age and number of prior convictions are the best predictors of recidivism. Shawn D. Bushway & Nidhi Kalra, *A Policy Review of Employers' Open Access to Conviction Records*, 4 Ann. Rev. Criminology 165, 176 (2021).

and treated him as a full-time employee in all other relevant respects. MTM and OnTime did not withhold any state or federal taxes from Mr. Blakney's wages as a result of this misclassification.

60.    The transportation services that Mr. Blakney provided as a driver were at the core of both MTM and OnTime's businesses.

61.    Mr. Blakney was paid by the day, rather than by the hour. As he was paid a set daily rate, MTM and OnTime did not adjust his pay when he performed his job more efficiently or skillfully, or when he took on extra assignments. Initially, in June 2021, he was paid $80 per day. He received a check for $880 every two weeks.

62.    A few months into his employment, his pay increased to $90 per day. From this point, Mr. Blakney received a check for $990 every two weeks. This daily rate fell well below the living wage.

63.    Mr. Blakney never received one-and-a-half time overtime pay for any hours worked over 40 in a workweek.

64.    Mr. Blakney's daily rate was not sufficient to provide him with overtime pay for hours worked over 40 in a workweek.

65.    These losses compounded over the years that Mr. Blakney worked for MTM, amounting to tens of thousands of dollars in unpaid wages and overtime.

66.    Mr. Blakney limits his unpaid wage claims against MTM to after March 15, 2024.[26]

---

[26] Separately pending in this Court is *Harris v. Med. Transportation Mgmt., Inc.*, No. 1:17-cv-1371 (D.D.C. Apr. 11, 2025). On November 21, 2025, Mr. Blakney, along with 171 other current and former non-emergency medical transportation drivers, filed a pending motion to intervene as plaintiffs in that case for wages they allege they are owed for work performed under MTM's contracts with D.C. between July 13, 2014 and March 15, 2024. Pl.-Intervenors' Mot. for Leave to Intervene and Pls.' Mot. to Amend the Compl., *Harris v. Med. Transportation Mgmt., Inc.*, No. 1:17-cv-01371 (D.D.C. Nov. 21, 2025), Dkt. No. 271.

### IV.    MTM Is a General Contractor

67.    MTM is a general contractor within the meaning of D.C. Code §§ 32-1012(c), 32-1303(5).

68.    MTM is awarded contracts, and in turn parcels out this work to subcontractors like OnTime.

69.    As a general contractor, under D.C. law, MTM is jointly and severally liable to its subcontractors' employees for unpaid wages. D.C. Code §§ 32-1012(c), 32-1303(5).

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the D.C. Human Rights Act (DCHRA), D.C. Code § 2–1402.01 *et seq.* (Against MTM)

70.    Plaintiff repeats and realleges the foregoing paragraphs of this Complaint as if fully set forth herein.

71.    At all times relevant, MTM was Plaintiff's "employer" within the meaning of the DCHRA. D.C. Code § 2-1401.02.

72.    The DCHRA makes it illegal for an employer to "wholly or partially for a discriminatory reason based upon the actual or perceived[] race," "fail or refuse to hire, or to discharge, any individual." D.C. Code § 2-1401.11(a).

73.    The DCHRA further makes it unlawful "for any person to aid, abet, invite, compel, or coerce the doing of any of the" prohibited acts, "or to attempt to do so." D.C. Code § 2-1402.62.

74.    Under the "Effects Clause" of the DCHRA, D.C. Code § 2-1402.68, "despite the absence of any intention to discriminate, practices are unlawful if they bear disproportionately on

20

a protected class and are not independently justified for some nondiscriminatory reason." *Gay Rts. Coal. of Georgetown Univ. L. Ctr. v. Georgetown Univ.*, 536 A.2d 1, 29 (D.C. 1987) (en banc). Thus, discriminatory intent is not required to establish liability under the DCHRA.

75.  MTM's policy and practice of using an indiscriminate criminal background screening policy that excludes from employment persons with certain types of criminal convictions bears disproportionately on Black workers.

76.  MTM's criminal background screening policy is neither job-related nor consistent with business necessity. MTM's indiscriminate ban on certain types of criminal convictions fails to consider the nature and seriousness of the criminal offense, the amount of time that has passed since the conviction, and whether the offense has any relationship to the job at issue.

77.  MTM failed to provide a legitimate business purpose for its unlawful policy. Less discriminatory alternatives are available to MTM to achieve the same objectives, such as individually assessing criminal histories and considering factors such as job performance and age of the conviction.

78.  MTM's policy and practice of using an indiscriminate criminal background screening policy that excludes from employment persons with dated conviction records without a legitimate business purpose has harmed and continues to harm Plaintiff and constitutes unlawful discrimination on the basis of race in violation of D.C. Code § 2-1401.01 *et seq*.

79.  In implementing its unlawful policy, MTM also aided, abetted, invited, compelled, and coerced its subcontractors into unlawfully discriminating against Black employees.

80.  MTM's conduct has caused, and continues to cause, Mr. Blakney substantial losses in earnings and other employment benefits.

81.     Pursuant to D.C. Code § 2-1403.16, Mr. Blakney is entitled to declaratory and injunctive relief, civil penalties, compensatory relief, and reasonable attorneys' fees and costs incurred in bringing this action.

82.     MTM acted with evil motive, actual malice, or outrageous conduct in wanton, reckless, or willful disregard for the rights of the class of consumers. *See Daka, Inc. v. Breiner*, 711 A.2d 86, 98-99 (D.C. 1998). Therefore, MTM is liable for punitive damages.

## COUNT II
### Violation of the DCLWA's Living Wage Provision, D.C. Code § 2-220.01 *et seq.*
### (Against all Defendants)

83.     Plaintiff repeats and realleges the foregoing paragraphs of this Complaint as if fully set forth herein.

84.     MTM was the recipient of a D.C. contract worth more than $100,000 and, on information and belief, OnTime was a recipient of a subcontract with MTM, paid out of MTM's contract funds, worth more than $15,000. D.C. Code § 2-220.03(a).

85.     At all times relevant to this dispute, MTM was the general contractor for all of Mr. Blakney's work and is therefore jointly and severally liable for OnTime's violations of the DCLWA pursuant to D.C. Code § 32-1303(5).

86.     MTM and OnTime had an obligation to pay D.C.'s living wage rate to Mr. Blakney for all work performed in D.C. From January 1, 2022 to June 30, 2022, D.C.'s living wage was $15.50 per hour. From July 1, 2022 to December 31, 2022, D.C.'s living wage was $16.10 per hour. From January 1, 2023 to June 30, 2023, D.C.'s living wage was $16.50 per hour. From July 1, 2023 to December 31, 2023, D.C.'s living wage was $17 per hour. From January 1, 2024 to June 30, 2024, D.C.'s living wage was $17.05 per hour. From July 1, 2024 to the end of Mr. Blakney's employment, D.C.'s living wage was $17.50 per hour.

87. Mr. Blakney's daily rate fell well below the living wage throughout the entirety of his employment.

88. MTM and OnTime failed to pay Mr. Blakney the applicable living wage in violation of the DCLWA.

89. MTM and OnTime's violations of the DCLWA were willful in that MTM and OnTime knew or should have known that the purported daily rate paid to Mr. Blakney was insufficient to compensate him at the D.C. living wage rate for all hours worked.

90. For the period from March 15, 2024 onward, MTM is liable, individually and collectively, jointly and severally, to Plaintiff for unpaid overtime wages and unpaid minimum wages in such an amount to be proven at trial, plus statutorily available damages equal to three (3) times the amount of unpaid overtime wages, interest (both pre- and post-judgment), attorneys' fees, costs, and any other and further relief this Court deems appropriate. *See* D.C. Code § 32-1308(a)(1)(A).

## COUNT III
### Violation of the DCMWA's Overtime Provision, D.C. Code § 32-1003(c)
### (Against all Defendants)

91. Plaintiff repeats and realleges the foregoing paragraphs of this Complaint as if fully set forth herein.

92. The DCMWA entitles employees to overtime pay of at least one-and-a-half times the usual hourly wage for hours worked in excess of 40 per workweek.

93. Mr. Blakney regularly worked more than 40 hours in a workweek.

94. MTM and OnTime failed to pay Mr. Blakney at overtime rates for hours worked in excess of 40 in a workweek based on the D.C. minimum wage rate in violation of the DCMWA.

23

95.     MTM and OnTime's violations of the DCMWA were willful in that they knew or should have known that Mr. Blakney's flat rate was insufficient to provide him with overtime pay for hours worked over 40 in a workweek based on the D.C. minimum wage.

96.     For the period from March 15, 2024 onward, MTM is liable, individually and collectively, jointly and severally, to Plaintiff for unpaid overtime wages and unpaid minimum wages in such an amount to be proven at trial, plus statutorily available damages equal to three (3) times the amount of unpaid overtime wages, interest (both pre- and post-judgment), attorneys' fees, costs, and any other and further relief this Court deems appropriate. *See* D.C. Code § 32-1012.

**COUNT IV**
**Violation of the D.C. Wage Payment and Collection Law (DCWPCL), D.C. Code § 32-1301**
***et seq.* – Unpaid Wages**
**(Against all Defendants)**

97.     Plaintiff repeats and realleges the foregoing paragraphs of this Complaint as if fully set forth herein.

98.     At all times relevant, MTM and OnTime were Plaintiff's "employers" within the meaning of the DCWPCL, D.C. Code § 32-1301(1B), and are subject to the provisions of the DCWPCL.

99.     MTM is a general contractor within the meaning of D.C. Code § 32–1012(c) and is therefore jointly and severally liable for unpaid wages.

100.    The DCWPCL requires employers to pay employees all wages owed at the appropriate hourly rate.

101.    MTM and OnTime violated the DCWPCL by failing to timely pay Plaintiff all wages due, including overtime wages for hours over 40 in a workweek.

24

102. MTM and OnTime violated the DCWPL willfully, intentionally, and in bad faith.

103. For the period from March 15, 2024 onward, MTM, as a general contractor, is liable, individually and collectively, jointly and severally, to Plaintiff for all unpaid wages in such an amount to be proven at trial, plus statutorily available liquidated damages equal to three times the amount of unpaid wages, interest (both pre- and post-judgment), attorneys' fees, costs, and any other further relief this Court deems appropriate. *See* D.C. Code §§ 32-1303(5), 32-1308(a)(1)(A).

**COUNT V**
**Violation of the D.C. Wage Theft Prevention Amendment Act of 2014,**
**D.C. Code § 32-1001 *et seq.***
**(Against all Defendants)**

104. Plaintiff repeats and realleges the foregoing paragraphs of this Complaint as if fully set forth herein.

105. At all times relevant, Defendants MTM and OnTime were Plaintiff's "employers" within the meaning of D.C. Code § 32-1002(3) and are subject to the provisions of that Act.

106. The Wage Theft Prevention Amendment Act of 2014 amended the DCMWA, D.C. Code § 32-1001 *et seq.*, by requiring employers to "furnish to each employee at the time of hiring . . . a written notice" containing "(1) [t]he name of the employer . . . ; (2) [t]he physical address of the employer's main office . . . ; (3) [t]he telephone number of the employer; (4) [t]he employee's rate of pay and the basis of that rate, including . . . the applicable prevailing wages; . . . (5) [t]he employee's regular payday . . . ; and (6) [a]ny such other information as the Mayor considers material and necessary." *Id.* § 32-1008(c).

107.    The Act further requires that employers include certain information on an employee's paystubs, including the number of hours an employee worked in a pay period. *See id.* § 32-1008(b).

108.    MTM and OnTime did not provide Plaintiff any notice at the time of hire disclosing the statutorily required information.

109.    MTM and OnTime did not provide Plaintiff with paystubs that included hours worked.

110.    MTM and OnTime's actions were willful in failing to disclose the statutorily required information.

111.    MTM is liable, individually and collectively, jointly and severally, to Plaintiff for statutory penalties for each failure to provide the written notice required by D.C. Code § 32-1008(c), attorneys' fees, costs, and other legal or equitable relief as may be appropriate. *See* D.C. Code § 32-1308.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

1.  A declaratory judgment that the practices complained of herein are unlawful and violate the D.C. Human Rights Act of 1977, D.C. Code § 2-1402.01 *et seq.*;

2.  A permanent injunction against MTM, and all officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in the unlawful policies, practices, customs, and usages set forth herein;

3.  An order that MTM institute and carry out policies, practices, and programs that provide equal employment opportunities for individuals with criminal records who

would be eligible for employment under the D.C. Human Rights Act and that MTM eradicates the effects of past and present unlawful employment practices;

4.      An order for back pay and benefits lost by Plaintiff;

5.      An order for compensatory damages for emotional distress suffered by Plaintiff;

6.      An order for front pay for Plaintiff;

7.      An order for statutory, actual, and punitive damages for Plaintiff;

8.      Enter judgment against Defendants MTM and OnTime in favor of Plaintiff for all unpaid wages due as a result of Defendants' violations of the D.C. Wage Payment and Collection Law, D.C. Code § 32-1301 *et seq.*, plus an additional three (3) times the unpaid compensation owed, pursuant to D.C. Code §§ 32-1303(5), 32-1308(a)(1)(A);

9.      Enter judgment against Defendants in favor of Plaintiff for unpaid overtime wages and unpaid minimum wages as a result of Defendants' violations of the D.C. Minimum Wage Act, D.C. Code § 32-1001 *et seq.*, in such an amount to be proven at trial, plus statutorily available damages equal to three (3) times the amount of unpaid overtime wages.

10.     Enter judgment against Defendants in favor of Plaintiff for failure to provide notice of hire in violation of the D.C. Wage Theft Prevention Amendment Act of 2014, D.C. Code § 32-1008(c), plus a statutory penalty for each failure to provide the required written notice, and enjoin Defendants to provide the required notices;

11.     Enter judgment against Defendants in favor of Plaintiff for failure to furnish Plaintiff with paystubs listing the hours worked each pay period in violation of the D.C. Wage Theft Prevention Amendment Act of 2014, D.C. Code § 32-1008(b), plus a statutory penalty for each failure to provide the itemized paystub, and enjoin Defendants to provide the itemized paystubs;

27

12.     Enter judgment against Defendants in favor of Plaintiff for all unpaid wages and benefits due to Plaintiff as a result of their violation of the D.C. Workplace Fraud Act plus three times the unpaid wages and benefits owed in liquidated damages, $500 for each violation of the D.C. Workplace Fraud Act, and reasonable attorneys' fees and costs, all pursuant to the D.C. Wage Laws;

13.     Award Plaintiff all wages owed by Defendants for Plaintiff's work during the course of his employment;

14.     Award Plaintiff liquidated and compensatory damages to the fullest extent permitted under the law;

15.     Award Plaintiff litigation costs, expenses and attorneys' fees to the fullest extent permitted under the law;

16.     Award Plaintiff interest on all of the foregoing at the legal rate from the date of judgment until payment in full; and

17.     Award any other such relief this Court deems just and proper.

Dated: December 15, 2025                    Respectfully submitted,


<u>/s/ Sarah Bessell</u>
Sarah L. Bessell (Bar No. 219254)
sarah_bessell@washlaw.org
Madeleine Gates (Bar No. 90024645)
madeleine_gates@washlaw.org
Washington Lawyers Committee for Civil
Rights and Urban Affairs
700 14th St NW Suite 400
Washington, D.C. 20005
Phone: (202) 319-1000

Harini Srinivasan (Bar No. 1032002)
hsrinivasan@cohenmilstein.com
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW Suite 800
Washington, D.C. 20005
Phone: (202) 408-4600

*Attorneys for Plaintiff*